CHANDLER, Justice, for the Court:
¶ 1. This wrongful death action was brought against a private military contractor by Narjess Ghane, the mother of a deceased member of the Navy’s Sea, Air, and Land Force (SEAL) Team Five. Along with other members of SEAL Team Five, S02[1] Shapoor Alexander (Alex) Ghane Jr. was engaged in a live-fee, close-quarters combat training exercise at Mid-South Institute of Self Defense (“Mid-South”) when a bullet allegedly penetrated a ballistic[2] wall, striking S02 Ghane above his protective vest and killing him. Mid-South successfully moved for summary judgment on the ground that Mrs. Ghane’s claim would require the trial court to question military policy and operational decisions, thus raising a nonjusticiable political question. The defendants had previously unsuccessfully moved for summary judgment on the ground that S02 Ghane had signed a valid waiver of liability.
¶ 2. We reverse the trial court’s grant of summary judgment pertaining to the political-question doctrine, and affirm the trial court’s previous denial of summary judgment pertaining to the liability waiver. On the record before us, the defendants have failed to demonstrate that adjudication of this claim will require reexamination of matters inextricable from military policy and operational decisions. This tort action is based on the failure of the ballistic walla wall independently designed, constructed, and maintained by the defendants. The defendants have failed to demonstrate that military policy and operational decisions are essential to a determination of causation.
FACTS AND PROCEEDINGS BELOW
¶ 3. Mid-South is a privately owned live-fee training facility that the Navy SEALS have frequently rented for training exercises since the mid-1980s. John Shaw, the former owner of Mid-South and fifty-percent owner of JFS, LLC, the entity that now owns the property on which Mid-South is located, testified that, in the late 1980s, the SEALS who were training at Mid-South requested that Mid-South build shoothouses with ballistic walls. Shaw constructed the initial shoothouse walls with eight-inch railroad ties on both sides filled with eight-inches of sand.
¶ 4. The current general manager of Mid-South, Donald Sanders, testified that he was informally asked by the SEALS in the early 2000s to construct a shoothouse that more realistically represented structures the SEALS would encounter in the real world. Sanders and Shaw then designed and built thinner ballistic walls made of six-inch galvanized steel studs on each side, covered in an approximately three-eighths-inch-thick plastic, filled with limestone gravel. When designing and constructing the walls, they did not look to any other ranges, specifications, or guidebooks; nor did they consult an engineer. They tested the wall with multiple types of ammunition including rounds of 5.56mm “green-tip”[3] bullets and regular .308 cali *215 ber ammunition. According to Sanders, no rounds breached the walls, and the green tip bullets penetrated only one-third of the way through the walls. The tops of the walls were left open so that gravel levels could be observed and refilled as needed.
¶ 5. On January 30, 2008, SEAL Team 5 was training at Mid-South under direct orders from the U.S. Navy. The SEALS brought their own equipment, weapons, and ammunition. Navy range safety officers (RSOs) oversaw the close-quarter combat (CQC) training. The SEALS were using the twenty-eight room ballistic shoothouse to practice room clearing. As part of the training exercise, the RSO placed a hostile paper target on a ballistic wall while the SEALS were “stacked” immediately on the opposite side of the wall. During the course of the exercise, S02 Ghane was struck by a .223 caliber round (5.56mm NATO) of “green-tip” ammunition above his protective vest. Despite receiving immediate medical attention, he died from the wound shortly after being struck.
¶ 6. After the incident, both the Navy Criminal Investigative Services (NCIS) and Naval Special Warfare Group One (NSWG-1) conducted an investigation. A redacted copy of the subsequent NSWG-1 report was obtained by Mrs. Ghane through the Freedom of Information Act. The report includes extensive findings of fact, opinions, and conclusions. The following are excerpts from that report:

Findings of Fact

19. On or about October 18, 2007, the ST-5 Command master Chief (CMC) expressed some concern to Training Detachment (TRADET) personnel about the training tactics of [redacted].
20. TRADET personnel responded that [said training tactics] could be practiced at Mid South because the shoot house walls were ballistic.
47. [On the day S02 Ghane died], At approximately 1400, [name redacted] entered a room followed by a number of [redacted] members including [name redacted] and S02 Ghane.
50. SEAL team 5 members heard two snaps consistent with rounds exiting the wall at a high velocity and entering the first room.
51. As a result, SEAL Team 5 members- on the other side of the wall were hit by debris and saw debris coming in the first room.
52. S02 Ghane’s teammates heard him exclaim, and then saw S02 Ghane fall to the ground.

Opinions

1. S02 Ghane’s death occurred in the line of duty and not due to his own misconduct.
2. The cause of S02 Ghane’s death was a defective Shoot House wall that did not provide the ballistic protection advertised by Mid South and paid for by the Navy.
3. Despite the omission of SEAL Team FIVE’S statement of work from the NSWG-1 contract, Mid South knew that NSW units required ballistic protection sufficient for [green tip ammunition]. This opinion is supported by Mid South General Manager’s statement acknowledging testing with [green tip ammunition], the website representation that the shoot house walls were ballistic, and years of instruction for NSW trainees using [redacted].
[[Image here]]
5. Mid South comments concerning [redacted] training included representations that all walls in both shoot houses were ballistic, that paper tar *216 gets were sufficient without bullet traps, and that target placement was unrestricted.
6. The design and construction of Mid South’s current shoot house walls occurred ad hoc six years ago by the Mid South General Manager, who did not have any formal training, certification, or license in range engineering.
[[Image here]]
8. Possible design factors contributing to wall failure in this case include an insufficiently thick gravel wall, exposure of the interior gravel to changing weather conditions, and the lack of a ballistic steel plate within the wall.
9. The maintenance routine of randomly detecting and replacing worn plastic sheets and refilling low gravel levels was inadequate. This system focused more on the appearance of the wall exterior and tops than the condition of the contents inside the walls that stop bullet penetration. As such, that inspection regime was not able to adequately determine interior wall ballistic properties and degradation. Physical samples taken from the target area where the penetration occurred were clearly different from the gravel at the tops of the walls.
10. The testing that was the basis for proclaiming the shoot house walls ballistic was inadequate. The tests consisted of two repetitions, conducted six years ago, on the same wall, on the same day, under the same weather conditions, with new materials, and no objective criteria for measuring failure rates over time.
[[Image here]]
16. The effectiveness of any [military] inspection of Mid South shoot house walls is limited by the walls’ original design. Mid South’s current maintenance system is based on the appearance of non-ballistic exterior plastic retaining walls and the height of gravel levels at the top. Under the current design, it is impossible to check for interior wall degradation throughout the shoot house without cutting open every wall. Walls using ballistic steel allow inspectors to temporarily peel back the exterior material to inspect for interior degradation.

Recommendation

[[Image here]]
11.Recommend that no charges be brought against the TRADET safety officers on the scene. The ultimate cause of S02 Ghane’s tragic death stems from defective walls that were not ballistic as advertised and paid for in this case. While multiple factors, including the weather, ammunition, and tactics may have played a role, Naval Special Warfare’s inability to detect that the ballistic shoot house was not designed, built, maintained, or tested based on formal objective standards was a systematic and critical failure. This oversight began the first time any naval Special Warfare unit used the current shoot house walls approximately six years ago and continued until January 30, 2008. As such, Naval Special Warfare shares a collective responsibility in this case. Therefore, we, as a community, owe the memory of Alex Ghane our best efforts to ensure that such a tragic loss never happens again.
(Emphasis added.)
¶ 7. Mrs. Ghane filed suit against the defendants on January 30, 2009, specifically asserting that there were no allegations of comparative fault against any party not named as a defendant. The defendants’ answer asserted several affirmative defenses, including the comparative negli- *217 genee of “the United States Navy, members of the United States Navy SEAL Team # 5, and other members, officers or employees of the United States Navy.”
¶ 8. The defendants first moved for summary judgment on the ground that S02 Ghane had signed an unconditional release and hold-harmless agreement prior to training. The plaintiff argued that S02 Ghane was not a student at Mid-South at the time of his death, but rather was there under orders from the military and therefore did not fall within the scope of the release. The trial court denied the defendants’ motion for summary judgment, finding that questions of fact remained as to whether S02 Ghane had released the defendants from “liability for the walls the Defendants claimed could not be penetrated by the ammunition being used by the [SEALS] that day, whether those representations were made, whether the walls were penetrated by said ammunition and [S02 Ghane] killed as a result of the alleged misrepresentations and reckless disregard of the Defendants.”
¶ 9. The defendants moved again for summary judgment on September 23, 2011, arguing that the plaintiffs claims raised a nonjusticiable political question because adjudication of the claim would require the trial court to question military training decisions and strategies. The trial court granted summary judgment to the defendants as to the political question doctrine. Mrs. Ghane appealed.
DISCUSSION
I. THE POLITICAL-QUESTION DOCTRINE
¶ 10. Our standard of review of summary judgment and jurisdictional issues is de novo. Stringer v. Trapp, 30 So.3d 339, 341 (Miss.2010); Jones v. Billy, 798 So.2d 1238, 1239 (Miss.2001).
¶ 11. The political-question doctrine is a function of the constitutional separation of powers and was famously first articulated by Chief Justice Marshall in Marburg v. Madison, 5 U.S. (1 Cranch) 137, 170, 2 L.Ed. 60 (1803):
The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion. Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court.
“The political question' doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch.” Japan Whaling Ass’n v. American Cetacean Soc., 478 U.S. 221, 230, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986). Mississippi adopted the political question doctrine in In re Hooker, 87 So.3d 401 (Miss. 2012).
¶ 12. In Baker v. Carr, the United States Supreme Court provided six independent factors, any of which, if present, indicate the existence of a nonjusticiable political question:
1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; or
2) a lack of judicially discoverable and manageable standards for resolving it; or
3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or
4) the impossibility of a court’s undertaking independent resolution without expressing lack of the respect due *218 coordinate branches of government; or
5) an unusual need for unquestionable adherence to a political decision already made; or
6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). “Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question’s presence.” Id. at 217, 82 S.Ct. 691 (emphasis added). In order to determine whether a case will implicate a political question, a court “must analyze appellant’s claim as it would be tried, to determine whether a political question will emerge.” Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum Laden Aboard Tanker Dauntless Colocotronis, 577 F.2d 1196, 1202 (5th Cir.1978). “The Constitution emphatically confers authority over the military upon the executive and legislative branches of government.” Haig v. Agee, 453 U.S. 280, 292, 101 S.Ct. 2766, 2774, 69 L.Ed.2d 640 (1981). However, “not all cases involving the military are automatically foreclosed by the political-question doctrine.” Carmichael v. Kellogg, Brown & Root Services, Inc., 572 F.3d 1271, 1281 (11th Cir. 2009).
¶ 13. Private contractors are a significant step removed from the separation-of-powers concerns targeted by the political-question doctrine and the Baker factors. They “do not have independent constitutional authority and are not coordinate branches of government to which we owe deference.” Taylor v. Kellogg, Brown & Root Servs., Inc., 658 F.3d 402, 409 (4th Cir.2011). Private contractors therefore must meet a “double burden” in order to receive the protection of the political-question doctrine. McMahon v. Presidential Airways, Inc., 502 F.3d 1331, 1359 (11th Cir.2007). “First, [they] must demonstrate that the claims against [them] will require reexamination of a decision by the military .... [t]hen, [they] must demonstrate that the military decision at issue is .... insulated from judicial review.” Id. at 1359-1360. In negligence actions against private contractors, the question of causation is particularly relevant in evaluating whether a political question will be implicated: “[i]f we must examine the [military’s] contribution to causation, ‘political question’ will loom large.” Lane v. Halliburton, 529 F.3d 548, 561 (5th Cir.2008).
¶ 14. Here, we find that the defendants have failed to demonstrate that adjudication of thé ballistic wall’s failure would implicate a political question. On the facts before us, this case does not require reexamination of decisions made by the military and can be tried under the “judicially discoverable and manageable standards” of well-established state tort law.
¶ 15. The question of causation comes down to the design, construction, and maintenance of a ballistic wall at a rented training facility — conditions which were in place before the military took “operational control” of the facility. Before the training exercise occurred, Mid-South independently had designed, constructed, and tested the shoothouse walls, representing them to be capable of -withstanding the ammunition used and the training tactics employed. The Navy investigation found:
5. Mid South comments concerning [redacted] training included representations that all walls in both shoot houses were ballistic, that paper targets were sufficient without bullet traps, and that target placement was unrestricted.
*219 (Emphasis added.) Based on these representations, the “military operational control” that provides the context for this case is irrelevant to adjudication of the claim against Mid-South.
¶ 16. In McMahon v. Presidential Airways, Inc., 502 F.3d 1331 (11th Cir.2007), the Eleventh Circuit found no political question implicated[4] where the plaintiff alleged that the defendant contractor “negligently staffed, equipped, and otherwise operated [a flight transporting three soldiers that crashed into a mountain]. These allegations relate to areas of responsibility reserved to [the defendant contractor] by [the defendant’s contract with the military].” Id. at 1360. Here, the allegations relate to Mid-South’s contractual obligation to provide a training facility that would perform as represented. Again from the Navy report:
3. ... Mid South knew that NSW. units required ballistic protection sufficient for [green-tip ammunition]. This opinion is supported by Mid South General Manager’s statement acknowledging testing with [green tip ammunition], the website representation that the shoot house walls were ballistic, and years of instruction for NSW trainees using [redacted].
(Emphasis added.)
¶ 17. This case is distinguishable from Aktepe v. United States, 105 F.3d 1400 (11th Cir.1997), where a political question was implicated in a suit against the military where, during a joint training exercise, a U.S. ship accidentally fired a live missile at a Turkish ship. The court accurately stated that “[t]he Supreme Court has generally declined to reach the merits of cases requiring review of military decisions, particularly when those cases challenged the institutional functioning of the military in areas such as personnel, discipline, and training.” Id. at 1403. Unlike the case at hand, Aktepe was brought directly against a coordinate branch of government and directly challenged a military decision. Further, while S02 Ghane’s death occurred during the course of a training exercise, there is no claim that negligent military execution of the exercise caused his death.
¶ 18. This same logic distinguishes this case from several recent circuit cases Mid-South cites for the proposition that military operational control over contractors implicates a political question. “Military control over a contractor’s actions is one common way that evaluation of military decisions becomes necessary.” Harris v. Kellogg, Brown & Root Servs., Inc., 724 F.3d 458, 458 (3rd Cir.2013). In Carmichael v. Kellogg, Brown & Root Servs., Inc., 572 F.3d 1271 (11th Cir.2009), the Eleventh Circuit dismissed a case against a military contractor where a vehicle driven by a KBR employee rolled over while transporting fuel on a dangerous route in a military convoy. There, “military judgments governed the planning and execution of virtually every aspect of the convoy in which [the sergeant] was injured.” Id. at 1281. But there is no logical parallel between military control of a live convoy mission and the condition of a ballistic wall at a rented facility.
¶ 19. A district court in Pennsylvania recently concluded that “[adjudicating whether [defendant contractors] were required to warn of the dangers of asbestos in connection with the supply of propulsion turbines to the Navy for use in Navy *220 warships does not implicate a political question:”
Defendants contend that the court will necessarily have to rule on the prudence of the Navy’s use of asbestos ... [but] [plaintiff’s claims do not challenge the Navy’s wisdom in deciding to use asbestos, nor do they seek to second guess the Navy’s judgment as to the wisdom or propriety of its warning policy. Moreover, if successful, the claims will not make the Navy liable for any injury .... To be sure, a judicial inquiry into what Navy policy was ... at the time Plaintiff served on a Navy vessel may be required. Yet, this inquiry does not implicate the wisdom and soundness of the Navy’s policies or procedures. The issue here is what the policy was with respect to warnings, not what it might (or should) have been ....
Donn v. A.W. Chesterton Co., Inc., 842 F.Supp.2d 803, 815-16 (E.D.Pa.2012) (emphasis added). The court went on to distinguish Carmichael and related cases the way we distinguish them here:
These cases .... traverse a common thread different from this case. They require the courts to second guess military operational judgment, whether that be the speed and timing by which to send a military convoy through Iraq, or the wisdom of the military’s procedures for electrical repairs .... Indeed, adjudicating the claims in Carmichael and Taylor would require the Court to determine in hindsight whether the military policy was correct .... Thus, those cases present the type of claims the political question doctrine seeks to preclude from judicial review — claims that require courts to determine the wisdom of military policy.
Id. at 817-18 (emphasis added). Mrs. Ghane does not ask the trial court to question the wisdom of the training tactics used by the military on the day S02 Ghane died. Rather, the focus of this case is on the “defendants’ performance of its contractual obligations to the government ... rather than the advisability of any governmental policy-related decision.” Bixby v. KBR, Inc., 748 F.Supp.2d 1224 (D.Or.2010) (refusing dismissal of negligence suit against contractor). The Navy’s extremely thorough internal report demonstrates that the Navy felt free to “practice like we will fight” because Mid-South had first represented that its training facility was designed to handle such practice safely.
¶ 20. The defendants also fail to demonstrate that they will put forward a viable contributory negligence defense. Mississippi tort law allows for determination of percentage of fault in civil cases.[5] A jury would inevitably be required to reexamine military decisions if tasked with apportioning percentage of fault between the Navy and the defendants.[6] But Mrs. Ghane’s claim that the ballistic wall failed can “stand alone without implicating any decision committed to the discretion of the military.” McMahon v. Gen. Dynamics Corp., et al., 933 F.Supp.2d 682, 695 (D.N.J.2013). A New Jersey district court rejected a contractor’s argument that the manner in which it intended to defend itself would implicate a political question:
[The defendant] states that it will defend itself in a manner that will drag the Court into exacting evaluations of the *221 Army’s policies and the actions of its soldiers.... That argument is too broad; it would give defendants too much power to define the issues. Indeed, it would bar virtually any claim in which the contractor posited that the military, not itself, was at fault. In the great majority of cases dismissing claims on political question grounds, the allegedly faulty exercise of military judgment was the basis of the complaint, not of a hypothetical defense. [The plaintiff] does not challenge any order he was given, or indeed anything that occurred in Afghanistan. His allegation of a manufacturing defect could stand alone without implicating any decision committed to the discretion of the military.
Id. (emphasis added).
¶ 21. Sufficient evidence has been presented to allow this wrongful death action to proceed based on the allegation that the bullet penetrated the shoothouse wall because the wall’s design, construction, and maintenance was other than what it was represented to be by the defendant — ballistic — without contributory negligence by the Navy. Mid-South was acting independent of military control when it responded to the SEALS’ informal request for a more realistic ballistic wall by designing a wall “ad hoc,” without consulting an engineer or following any established specifications, military or otherwise.[7] The defendants have failed to demonstrate that the military’s training tactics — such as S02 Ghane’s position in the shoothouse, the placement of targets, and the choice of ammunition — exceeded the scope of what Mid-South represented its facility could handle.[8] Military policy and training tactics are therefore irrelevant for purposes of causation.
¶ 22. Mid-South’s liability for the defective wall would not be lessened by the Navy’s conclusion that different Navy oversight policies could have prevented this tragedy. The “collective responsibility” assumed by the Navy does not translate into apportioned tort liability. That “admission” addresses additional safety policies beyond and distinct from Mid-South’s liability for failing to provide a facility that performed as represented to the Navy. On the record before us, adjudication of the claim under state tort law will not implicate a political question. We therefore reverse the trial court’s grant of summary to the defendants.
II. THE RELEASE S02 GHANE SIGNED DID NOT RELIEVE MID-SOUTH FROM LIABILITY.
¶ 23. We affirm the trial court’s denial of the defendant’s first motion for summary judgment arguing that S02 Ghane signed a release prior to training exculpating defendants from liability. Mississippi law “does not look with favor on contracts intended to exculpate a party from the liability of his or her own negligence although, with some exceptions, they are enforceable.” Tumbough v. Ladner, 754 So.2d 467, 469 (Miss.1999) (citations omitted). “[W]e do not sanction broad, general ‘waiver of negligence’ provisions, and strictly construe them against the party asserting them as a defense.” Id. In Tumbough, a scuba diving student *222 brought suit against his instructor after he because ill with decompression sickness after participating in her scuba certification classes, alleging that the instructor was negligent in planning the depths of the dives and in failing to make necessary-safety stops during the dive. Id. at 468. We reversed the trial court’s grant of summary judgment to the defendant (based on the plaintiffs signing a waiver of liability):
Assuming [the student] was aware of the inherent risks in scuba diving, it does not reasonably follow that he, a student, intended to waive his right to recover from [the instructor] for failing to follow ... basic industry safety standards.
We found that the student “did not knowingly waive his right to seek recovery for injuries caused by the instructor’s failure to follow basic safety guidelines that should be common knowledge to any instructor of novice students.” Id. at 470. We further found that “contracts attempting to limit the liabilities of one of the parties would not ‘be enforced unless the limitation is fairly and honestly negotiated and understood by both parties’ ” and that, because the contract was preprinted and not negotiated, the terms should be “strictly construed against the party seeking to enforce such a provision.” Id. (citations omitted).
¶ 24. We find that the trial court correctly denied the defendants’ motion for summary judgment at this stage. The release S02 Ghane signed was a preprint-ed, general release. As in Tumbough, it is not reasonable that S02 Ghane, an experienced Navy SEAL, intended to release the defendants from following even basic safety standards in the design of the ballistic wall or the failure of the wall to perform as advertised. We further find merit to the plaintiffs argument that S02 Ghane does not fall within the scope of the release because he was not a “student” being taught or instructed by Mid-South at the time of his death, as he was under orders from the military to train at the facility.
CONCLUSION
¶ 25. The political-question doctrine rarely operates to bar a plaintiffs claim and does not operate to do so here. On the facts before us, the defendants have not met their burden to show that Mrs. Ghane’s wrongful death claim is inextricable from the formulations established by the Baker factors and cannot be adjudicated without impheating a political question. We therefore reverse the trial court’s grant of summary judgment as pertains to the political-question doctrine. We affirm the trial court’s denial of summary judgment as to the liability waiver.
¶ 26. AFFIRMED IN PART; REVERSED IN PART; REMANDED.
RANDOLPH, P.J., KITCHENS, pierce And king, jj. concur. DICKINSON, P.J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION. LAMAR, J. DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J., AND COLEMAN, J.

.Special Warfare Operator (Second Class). "In May 2006 the U.S. Navy authorized the establishment of the Special Warfare Operator (SO) general rating to allow Enlisted Sailors to focus on rating-specific technology, skill sets, and training systems .... As of October 1, 2006, the Enlisted SEAL Warfare Designation (NSW Rating) became "Special Warfare Operator” (SO), representing its own specialized navy career path.” http:// navyseals.com/nsw/learn-about-the-us-navy-seals/ (last visited January 3, 2014).

. Bullet-proof.

. "Green-tip” bullets contain a tungsten core designed to penetrate farther than a standard bullet. The 5.56mm military designation is comparable to a .223 caliber bullet.

. We note that the court found no political question implicated on the record before it, and left open the possibility that further development of the case might implicate a political question. Presidential Airways, Inc., 502 F.3d at 1360.

. See Miss.Code Ann. § 85-5-7 (Rev.2011); Miss.Code Ann. § 11-7-15 (Rev.2004); Fielder v. Magnolia Beverage Co., 757 So.2d 925, 933 (Miss.1999). A jury can apportion a percentage of fault even to an immune nonparty.

. See Harris v. Kellogg, Brown & Root Servs., Inc., 724 F.3d 458 (3rd Cir.2013).

. This distinguishes this case from Boyle v. United Technologies, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), where a claim against a private jet manufacturer was non-justiciable where the military had particularly requested a certain type of jet engine.

. The defense's argument may be analogized to a mother saying that, if she had not asked her son to go to the store, he would not have been killed by a drunk driver.