# IN THE SUPREME COURT OF TEXAS

════════

No. 15-0932

════════

AMERICAN K-9 DETECTION SERVICES, LLC AND
HILL COUNTRY DOG CENTER, LLC,
PETITIONERS,

v.

LATASHA FREEMAN, RESPONDENT

════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS

════════════════════════════════

**Argued December 7, 2017**

CHIEF JUSTICE HECHT delivered the opinion of the Court, in which JUSTICE GREEN, JUSTICE JOHNSON, JUSTICE LEHRMANN, JUSTICE BOYD, JUSTICE BROWN, and JUSTICE BLACKLOCK joined.

JUSTICE GUZMAN filed a dissenting opinion.

JUSTICE DEVINE filed a dissenting opinion, in which JUSTICE GUZMAN joined.

To protect the separation of powers essential to the structure and function of American governments, the political question doctrine teaches that the Judicial Branch will abstain from matters committed by constitution and law to the Executive and Legislative Branches.[1] "The complex[,] subtle, and professional decisions as to the composition, training, equipping, and control

---

[1] *See Baker v. Carr*, 369 U.S. 186, 210–211 (1962); *Neeley v. W. Orange-Cove Consol. Indep. Sch. Dist.*, 176 S.W.3d 746, 777–778 (Tex. 2005).

of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches."[2] Among United States military troops stationed in war zones are dogs who protect soldiers and others by sniffing out enemy improvised explosive devices ("IEDs"). The claim in this case is that because of negligent training and handling by private military contractors, one such dog bit the plaintiff on a U.S. Army base in Afghanistan. The defense is that the incident was caused by the Army's use and prescribed manner of quartering the dog. We conclude that the dispute cannot be resolved without inquiry into military judgments that the political question doctrine precludes. We hold that the claim is nonjusticiable and, therefore, the district court correctly dismissed it. We reverse the judgment of the court of appeals[3] and render judgment accordingly.

## I

In 2011, respondent LaTasha Freeman, a civilian employed as an administrative clerk by a private military contractor, was stationed at Camp Mike Spann, a U.S. Army base near Mazar-i-Sharif in northern Afghanistan. The base was a secured military position supporting tactical combat operations in the heart of the war zone. Named for the first American combat casualty in Afghanistan after the fall of the Taliban in 2001, the base opened in 2006 and once held some 2,000 coalition troops. The United States turned it over to the Afghans in April 2014.

Stationed among the troops at Camp Mike Spann were explosive-detection dogs provided to the Army to sniff for IEDs. IEDs have been called "the No. 1 killer of civilians and troops in

---

[2] *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973).

[3] 494 S.W.3d 393 (Tex. App.—Corpus Christi 2015).

2

Afghanistan."[4] The Pentagon has reportedly concluded that "the best weapon against IEDs [is] still a handler and his dog."[5] Another report states that "[o]n average, these four-footed soldiers are 98 percent accurate in their detection abilities . . . and depending on the task and climate, can work up to 12 hours a day."[6]

One such dog, Kallie, was owned by petitioner American K-9 Detection Services, LLC ("AMK9"), a Florida company, which contracts with the Department of Defense to provide teams of "contract working dog[s]" and handlers to the Armed Services. The dog–handler teams are trained in the United States, then deployed to Afghanistan. As Freeman concedes, "AMK9 provides these services which protect our national security. . . . The job that they do as far as training and having their dogs go out and sniff for bombs to protect our soldiers out in the field is absolutely critical to protecting our soldiers, protecting our civilians". Kallie was trained by AMK9 and a Texas company, petitioner Hill Country Dog Center, LLC.

One morning, Freeman had walked with a coworker to a security checkpoint to escort arriving vehicles to their parking places. She was standing a few yards from the animal shelter in which Kallie was housed. The AMK9 incident report states that Kallie's handler was nearby, as well as another dog handler who was searching a vehicle, but Freeman says she did not see them. According to Freeman, Kallie ran through the shelter's open door towards her and jumped at the

[4] Sean Carberry, *Sniffing Out Bombs in Afghanistan: A Job That's Gone to the Dogs*, NPR (March 8, 2013), http://www.npr.org/2013/03/10/173815691/sniffing-out-bombs-in-afghanistan-a-job-thats-gone-to-the-dogs.

[5] Rebecca Frankel, Essay, *Military Dogs Sniff Out IEDs, Save Lives*, WALL STREET J. (Oct. 31, 2014), http://www.wsj.com/articles/military-dogs-sniff-out-ieds-save-lives-1414772453.

[6] Maryann Mott, *Dogs of War: Inside the U.S. Military's Canine Corps*, NAT'L GEOGRAPHIC (Apr. 9, 2003), http://news.nationalgeographic.com/news/2003/04/0409_030409_militarydogs.html.

back of her left shoulder. Kallie bit Freeman's shoulder and "shook [Freeman's] left arm violently back and forth." Kallie then bit Freeman's right buttock and pulled down on her pants pocket. The incident report states that Kallie's handler quickly regained control of her. Freeman says a bystander pulled Kallie off her. Kallie's bites did not break Freeman's skin. The incident report states: "Injured Person(s) . . . NONE", "Nature of injury . . . NONE", "Details of First Aid / Medical Attention / Hospitalization / Evacuation / Leave . . . NONE", and "Nature of Damage / Loss . . . Small puncture mark on left sleeve of jacket."

Kallie's kennel in the shelter had 2 adjacent holding pens separated by a vertical divider and open at the top. The door to Kallie's side of the kennel was shut, but the door to the adjoining pen was not. According to the incident report, Kallie managed to jump over the divider between the 2 pens and escape out that pen's and the shelter's open doors. She was running over to her handler when she saw Freeman. "In her playful yet rough manner", the report continues, Kallie "jumped up against" Freeman "to play and seek attention, but in doing so snapped her jaw and punctured the left front sleeve of [Freeman's] jacket."

A week later, AMK9's project manager emailed Freeman to apologize for the incident. "The Army guys", he said, "had built new kennels" without tops on them, and Kallie had jumped over a divider between pens in the kennel and run out the open door of the other pen. Following the incident, the manager said, "[t]ops [were] put on the kennels and the handler was reprimanded." He explained that Kallie was "a very playful dog", that "the soldiers play tug a war and the dogs will mouth them as well as jump[] around," and that Kallie "was just trying to play with" Freeman. Freeman had not been "attacked", he said; "when these dogs are given the command attack, there

4

are serious injuries to follow". "These Dogs are here to help keep you, me, soldiers and everyone else at these [forward operating bases] as safe as possible," he said. "[T]he last thing we want is one of our own being injured by the dogs[;] we are all on the same team over here." The manager offered to replace Freeman's jacket.

In 2013, Freeman filed a claim against her employer and its carrier under the Defense Base Act,[7] an extension of the Longshore and Harbor Workers' Compensation Act,[8] which she later settled for $250,000. She also sued AMK9 and Hill Country, alleging that they were negligent in training Kallie and her handler and in failing to restrain her. She now claims to suffer from complex regional pain syndrome and to be completely disabled. She seeks $1 million in damages.

According to AMK9, the Army designed and built Kallie's kennel with no top and required AMK9 to use it. Because the kennel design allowed Kallie to escape, AMK9 asserts that Freeman's injuries were caused by the Army. AMK9 filed a plea to the jurisdiction asserting that Freeman's claims are nonjusticiable under the political question doctrine because they require an assessment of the Army's involvement in causing her alleged injuries.[9] AMK9 also moved to have the Army and the Department of Defense named responsible third parties under Chapter 33 of the Texas

---

[7] 42 U.S.C. §§ 1651–1654.

[8] 33 U.S.C. §§ 901–950.

[9] AMK9's plea also asserted that it is entitled to derivative sovereign immunity and that Freeman's claims are preempted under the Federal Tort Claims Act's combatant-activities exception, 28 U.S.C. § 2680(j), and under the Defense Production Act of 1950, 50 U.S.C. §§ 4501–4568.

Practice and Remedies Code.[10] The trial court granted that motion, granted AMK9's plea, and dismissed the case.

The court of appeals reversed and remanded the case for further proceedings.[11] The court acknowledged AMK9's assertion that the Army's actions were the proximate cause of the incident but rejected the application of the political question doctrine, concluding that AMK9 had "produced [no] evidence that the Army, in failing to design and build the kennel such that the pen dividers extended to the ceiling, could have reasonably foreseen that such failure would result in injuries to a person outside the kennel."[12] The court also faulted AMK9 for not having "presented any evidence establishing that the Army was actually negligent in designing the kennel."[13]

We granted AMK9's and Hill Country's petitions for review.[14]

## II

### A

In *Marbury v. Madison*, Chief Justice Marshall declared that "[i]t is emphatically the province and duty of the judicial department to say what the law is."[15] To the courts alone belongs

---

[10] TEX. CIV. PRAC. & REM. CODE §§ 33.001–.017.

[11] 494 S.W.3d 393, 411 (Tex. App.—Corpus Christi 2015).

[12] *Id.* at 403.

[13] *Id.*

[14] 60 Tex. Sup. Ct. J. 1606 (Sept. 1, 2017).

[15] 5 U.S. (1 Cranch) 137, 177 (1803).

the power to authoritatively interpret the constitution.[16] But the limits on judicial power are as

important as its reach. "The province of the court", Chief Justice Marshall wrote,

> is, solely, to decide on the rights of individuals, not to inquire how the executive, or executive officers, perform duties in which they have a discretion. Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court.[17]

The Supreme Court expanded on this political question doctrine in *Baker v. Carr*, setting out

6 tests for identifying issues beyond the courts' power to decide.[18] Important here are the first 2: "a

textually demonstrable constitutional commitment of the issue to a coordinate political department;

---

[16] *See W. Orange-Cove Consol. Indep. Sch. Dist. v. Alanis*, 107 S.W.3d 558, 563 (Tex. 2003) ("The final authority to determine adherence to the Constitution resides with the Judiciary.").

[17] *Marbury*, 5 U.S. (1 Cranch) at 170.

[18]

It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. 186, 217 (1962).

*Baker* distinguished between nonjusticiable issues, like political questions, and jurisdictional issues. Unlike cases over which the court lacks jurisdiction, "[i]n the instance of nonjusticiability, consideration of the cause is not wholly and immediately foreclosed; rather, the Court's inquiry necessarily proceeds to the point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded." *Id.* at 198. In Texas, "[s]ubject matter jurisdiction requires . . . that the case be justiciable." *State Bar of Tex. v. Gomez*, 891 S.W.2d 243, 245 (Tex. 1994). Some cases "lack[] justiciability from the moment of pleading," while in others, "the court must retain certain limited authority" to develop the issue and dispose of the case. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 865 (Tex. 2010).

or a lack of judicially discoverable and manageable standards for resolving it".[19] The 2 tests, the Supreme Court has explained, are related: "the lack of judicially manageable standards may strengthen the conclusion that there is a textually demonstrable commitment to a coordinate branch."[20]

*Baker* was careful to note that the doctrine "is one of 'political questions,' not one of 'political cases.' The courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority."[21] The issue in *Baker* was deeply political: whether states could apportion legislative districts with unequal numbers of voters.[22] Indeed, as the Supreme Court has observed, *Marbury* itself "was also a 'political' case, involving as it did claims under a judicial commission alleged to have been duly signed by the President but not delivered."[23] The application of the doctrine depends not at all on whether an issue is political—few statutory and constitutional issues are not at least in some sense political—but rather on whether an issue is committed to another branch of government and therefore outside the judiciary's authority to address.

---

[19] *Baker*, 369 U.S. at 217.

[20] *Nixon v. United States*, 506 U.S. 224, 228–229 (1993).

[21] *Baker*, 369 U.S. at 217.

[22] *See id.* at 192–195.

[23] *INS v. Chadha*, 462 U.S. 919, 943 (1983).

"The nonjusticiability of a political question", as *Baker* states, "is primarily a function of the separation of powers."[24] In the federal courts, "[t]he political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch."[25] The separation of the powers of government, implicit in the United States Constitution, is explicit in the Texas Constitution, which states:

> The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are Legislative to one; those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.[26]

We have assumed that the *Baker* factors that "define nonjusticiable political questions for purposes of demarcating the separation of powers in the federal government under the United States Constitution . . . serve equally well in defining the separation of powers in the state government under the Texas Constitution".[27] But in this case, we must consider the separation of powers among the Texas judiciary and the federal Executive and Legislative Branches. We think that separation is implicitly required by our state constitutional provision, as well as by principles of federalism, and mirrors the same separation of powers among the branches of government in Texas. So while we are guided in our view of the political question doctrine by *Marbury* and *Baker* as well as by other

---

[24] 369 U.S. at 210.

[25] *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).

[26] TEX. CONST. art. II, § 1.

[27] *Neeley v. W. Orange-Cove Consol. Ind. Sch. Dist.*, 176 S.W.3d 746, 778 (Tex. 2005).

federal-court decisions, we apply the doctrine here as required for the separation of powers mandated by the Texas Constitution.

"The [United States] Constitution emphatically confers authority over the military upon the executive and legislative branches of [the federal] government."[28] Article I gives Congress the power to declare war and to raise, organize, support, arm, and discipline the military.[29] And Article II makes the President Commander-in-Chief of the Armed Forces.[30] As the Supreme Court has observed, "[t]he complex[,] subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches."[31] Moreover, "the Government's interests in military matters reasonably include limiting its own expenditure of scarce resources on the unmilitary task of participating in lawsuits as well as reducing contractors' liability exposure for the sake of future procurement efforts."[32] Just as the federal political question doctrine limits federal-court review of military decisions, Texas' political question doctrine limits state-court review of those decisions.[33]

---

[28] *Aktepe v. United States*, 105 F.3d 1400, 1403 (11th Cir. 1997).

[29] U.S. CONST. art. I, § 8, cl. 11–16.

[30] *Id.* art. II, § 2.

[31] *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973).

[32] *McManaway v. KBR, Inc.*, 554 F. App'x 347, 350 (5th Cir. 2014) (Jones, J., dissenting from the denial of rehearing en banc).

[33] *Cf. Ghane v. Mid-S. Inst. of Self Defense Shooting, Inc.*, 137 So. 3d 212, 217–218 (Miss. 2014). The Mississippi Supreme Court has followed a similar trajectory in adopting a political question doctrine gleaned from the federal doctrine. In *In re Hooker*, 87 So. 3d 401, 404 (Miss. 2012), the court borrowed from federal jurisprudence to analyze a case implicating the separation of powers within the Mississippi government, that is, between the Mississippi

Not all cases involving the military are foreclosed by the political question doctrine.[34] Ordinary tort suits, for example, may be within the competence of a court to decide, even when touching on military matters,[35] but not when "[t]he interjection of tort law into the realms of . . . military affairs would effectively permit judicial reappraisal of judgments the Constitution has committed to the other branches."[36] Each case requires "a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in light of its nature and posture in the specific case, and of the possible consequences of judicial action."[37] The political question must be "inextricable from the case".[38] Importantly, the court "must analyze [the case] as it would be tried, to determine whether

---

governor and judiciary, because its "state government was modeled after the federal system." In *Ghane*, the court applied the doctrine to a tort claim involving military decisions and a private military contractor, noting that it had "adopted the political question doctrine in [*Hooker*]." 137 So. 3d at 217.

[34] *See Baker v. Carr*, 369 U.S. 186, 211 (1962) ("[I]t is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance."); *Gilligan*, 413 U.S. at 11–12 ("[W]e neither hold nor imply that the conduct of the National Guard is always beyond judicial review or that there may not be accountability in a judicial forum for violations of law or for specific unlawful conduct by military personnel".).

[35] *See McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1364 (11th Cir. 2007) (in a suit against a civilian company that contracted with the military to provide air travel to service members, explaining that the second *Baker v. Carr* factor did not apply because "[i]t is well within the competence of a federal court to apply negligence standards to a plane crash").

[36] *Aktepe v. United States*, 105 F.3d 1400, 1404 (11th Cir. 1997).

[37] *Baker*, 369 U.S. at 211–212.

[38] *Id.* at 217.

a political question will emerge."[39] And "[i]f we must examine the Army's contribution to causation, 'political question' will loom large."[40]

**B**

In determining how to apply the political question doctrine to a claim against a private military contractor like the claim in this case, an initial consideration is whether adjudicating the claim will require reexamination of a military decision.[41] When a contractor operates under the military's plenary control, the contractor's decisions may be considered de facto military decisions.[42] In one case, for example, the wife of an Army sergeant who was injured while escorting a large military convoy sued the contractor that operated the tanks.[43] She asserted that the contractor-employed driver of the tank on which her husband was injured had negligently driven too fast under the circumstances, failed to keep a proper lookout, and failed to inspect the tank before operating it.[44] She sued the contractor for the driver's negligence and for negligent hiring and entrustment.[45] The court concluded that the case would require reexamination of military decisions, "includ[ing]

---

[39] *Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum Laden Aboard Tanker Dauntless Colocotronis*, 577 F.2d 1196, 1202 (5th Cir. 1978).

[40] *Lane v. Halliburton*, 529 F.3d 548, 561 (5th Cir. 2008).

[41] *See Harris v. Kellogg Brown & Root Servs., Inc.*, 724 F.3d 458, 466 (3d Cir. 2013) ("Because defense contractors are not coordinate branches of government, a determination must first be made whether the case actually requires evaluation of military decisions."); *Lane*, 529 F.3d at 560 (explaining that the first, "textual commitment" *Baker v. Carr* factor requires the defendant to "demonstrate that the claims against it will require reexamination of a decision *by the military*" (quoting *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1359 (11th Cir. 2007))).

[42] *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1276–1277 (11th Cir. 2009).

[43] *Id.* at 1275–1276.

[44] *Id.* at 1279.

[45] *Id.*

12

the military's decision to utilize civilian contractors in conducting the war in Iraq" and to utilize them in the mission in which the sergeant was injured.[46] The military had plenary control over the convoy, including deciding the date and time for departure, the route, the size, the speed, and the security measures.[47] Even if the driver bore some blame for the accident, the court reasoned, the contractor would surely argue that the military commander was negligent in his decisions about the convoy.[48] And while the driver was physically in control of the tank and could have ignored his orders, the contractor's defense would necessarily involve military orders.[49] Thus, the case would require evaluating decisions over which the military retained plenary control, and the court upheld the district court's dismissal.[50]

Even when the contractor retains discretion over its actions, unreviewable military decisions may still be implicated by either the plaintiff's claims or the defendant's defenses.[51] "We must look beyond the complaint, considering how the Plaintiff[] might prove [her] claims *and* how [the defendant] would defend."[52] Causation defenses, in particular, often pose political questions when the court must disentangle the military's and contractor's respective causal roles.

---

[46] *Id.* at 1281.

[47] *Id.* at 1281–1282.

[48] *Id.* at 1286.

[49] *See id.* at 1284.

[50] *Id.* at 1296.

[51] *Harris v. Kellogg Brown & Root Servs., Inc.*, 724 F.3d 458, 467 (3d Cir. 2013).

[52] *Lane v. Halliburton*, 529 F.3d 548, 565 (5th Cir. 2008).

A proportionate-liability defense may inject a nonjusticiable political question into a case.[53] For example, the family of a soldier electrocuted while showering in military barracks sued a contractor for failing to properly ground the water pump.[54] The contractor argued in defense that the military's actions were the sole proximate cause of the death because it had chosen unsafe barracks with significant electrical problems.[55] The court reasoned that a sole-cause defense would not raise nonjusticiable issues because, while it would require determination of facts related to strategic military decisions, it would not require the fact-finder "to reexamine their wisdom."[56] On the other hand, the court explained, determining whether the military was a proximate cause for apportioning responsibility would create nonjusticiable issues because "there is simply no way to determine damages without evaluating military decisions. The fact-finder cannot decide the respective degrees of fault as between a military contractor . . . and the military without evaluating the decisions made by each".[57] In the latter situation, the court concluded that "[e]liminating the plaintiff['s] claims for [those] damages [was] the appropriate solution".[58]

---

[53] *Harris*, 724 F.3d at 474; *cf. Fisher v. Halliburton*, 667 F.3d 602, 621 (5th Cir. 2012) ("Whether this case presents a nonjusticiable political question is a significant issue, particularly since [the contractor] sought to have the role of the United States considered under section 33.004(I) of [the] Texas Civil Practice and Remedies Code not as a party to the litigation, but as a responsible third party.").

[54] *Harris*, 724 F.3d at 463.

[55] *See id.* at 470–472.

[56] *Id.* at 473.

[57] *Id.* at 474.

[58] *Id.* at 475. *Harris* held that the political question doctrine would apply only if a proportionate-liability system applied. *Id.* The district court had not yet ruled which state's law applied, so the circuit court remanded the case with instructions to dismiss if the district court found that the law of a state with a proportionate-liability scheme (including Texas) applied. *Id.* at 482.

Similarly, a contributory-negligence defense may require reexamination of military decisions if it requires considering the fault of a military decision-maker.[59] After a power outage, a Marine was electrocuted while trying to install a backup generator.[60] Despite being told not to turn on the main generator because a group of Marines was working on it, the contractor turned it on, resulting in the Marine's injuries.[61] The contractor asserted a contributory-negligence defense, which would have required the court to decide whether the Marines were reasonable in trying to install the additional generator and whether backup power should have been supplied to that area.[62] The defense made the claim nonjusticiable.[63]

## C

Even if a claim requires reexamination of a military decision, that decision must be one that is "insulated from judicial review."[64] "[D]ecisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments" beyond judicial review.[65] Some decisions, such as whether to employ military force or the proper tactics to use during combat,

---

[59] *See Taylor v. Kellogg Brown & Root Servs., Inc.*, 658 F.3d 402, 411–412 (4th Cir. 2011).

[60] *Id.* at 404.

[61] *Id.*

[62] *Id.* at 411–412.

[63] *Id.* at 412.

[64] *Lane v. Halliburton*, 529 F.3d 548, 560 (5th Cir. 2008) (quoting *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1360 (11th Cir. 2007)).

[65] *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973).

are clearly professional military judgments that are beyond the judiciary's competence.[66] But other decisions, at first glance appearing to be decisions similar to those civilians make and subject to judicial review, are still yet "complex[,] subtle, and professional decisions"[67] that bear on military strategy.

As one circuit court has observed, "[h]ousing and maintenance decisions on a battlefield are exactly this type of decision".[68] In the case of the soldier electrocuted while showering, the contractor's proportionate-liability defense injected a political question into the case.[69] The fact-finder would be required to review "the military's decisions to house troops in unsafe barracks that would not be repaired."[70] To choose which barracks in which to house troops and whether to repair them, the military must consider issues unique to the battlefield such as the danger relative to other options and the cost of repair relative to other uses of its scarce resources. Judges lack not only the constitutional authority but also the expertise to evaluate these decisions.

## III

We turn now to the "discriminating analysis"[71] required to apply these considerations in the political question doctrine to this case.

---

[66] *Tiffany v. United States*, 931 F.2d 271, 277 (4th Cir. 1991).

[67] *Gilligan*, 413 U.S. at 10.

[68] *Harris v. Kellogg Brown & Root Servs., Inc.*, 724 F.3d 458, 478 (3d Cir. 2013).

[69] *Id.* at 474.

[70] *Id.*

[71] *Baker v. Carr*, 369 U.S. 186, 211 (1962).

AMK9 contends that the Department of Defense (with which it contracted to provide Kallie) and the Army (in which Kallie served) caused Freeman's injuries, in part because the Army built (and rebuilt) Kallie's kennel to comply with its regulations and required AMK9 to use it. The trial court granted AMK9's motion to designate the Department and the Army as responsible third parties, thereby requiring "[t]he trier of fact . . . [to] determine [their] percentage of responsibility . . . for . . . causing or contributing to cause" Freeman's injury.[72] Thus, as one court has observed, the political question doctrine "loom[s] large."[73]

Freeman argues that the Department and the Army cannot be joined as responsible third parties because, as alleged by AMK9, their only duty to construct dog kennels was contractual and does not supply a sufficient legal standard for determining an allocation of responsibility to them. We think the contractual duty is sufficient, but in any event, the Army undertook to build Kallie's kennel and remediate it and required Kallie to use it. Had the actor been a private entity rather than the Army, these facts alone would support a negligent-undertaking claim.[74] Therefore, we must decide whether litigating this case, including AMK9's proportionate-responsibility defense, will necessarily require reexamination of sensitive military decisions.

The military had plenary control over at least some of the decisions implicated by Freeman's claim. AMK9's contention that Freeman's alleged injury occurred when Kallie jumped over an internal partition between pens and escaped through an adjacent pen's open door calls into question

---

[72] TEX. CIV. PRAC. & REM. CODE § 33.003(a).

[73] *Lane v. Halliburton*, 529 F.3d 548, 561 (5th Cir. 2008).

[74] *See Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837 (Tex. 2000) (recognizing "a duty to use reasonable care . . . when a person undertakes to provide services to another, either gratuitously or for compensation").

the Army's design decisions not to extend the internal partition to the ceiling and not to cover the kennel. The Army designed and constructed the kennel and required AMK9 to use it. While Freeman argues that only AMK9's negligent failure to train and control Kallie caused her injury, AMK9 argues, and will argue at trial, that the Army's design was to blame. AMK9's proportionate-liability defense requires the fact-finder to evaluate these decisions. The Army's design decisions would be front and center at trial. On that point, this case is virtually indistinguishable from *Harris*, in which the United States Court of Appeals for the Third Circuit held that a private contractor's proportionate-liability defense would render the case nonjusticiable.[75] If this case were to proceed, the fact-finder would be required to determine the degree to which the Army was responsible for Freeman's injury. This inquiry would require a reexamination of Army decisions, contrary to *Baker*'s first factor.

The Army's decisions about designing and constructing the kennels are unreviewable military decisions because they go to the equipping of the military, constitutionally committed to the federal political branches. This includes decisions about base configuration, including the design for kennels that house trained explosive-detection dogs like Kallie. Such decisions are similar to decisions about the quartering of soldiers and require similar risk-weighing judgments and allocation of scarce resources. Here, it is undisputed that the Army did not comply with its internal requirement to construct the kennel in a certain way, and a court should not insert itself into determining whether the Army should or should not have followed its guidelines. Were the roofs left off in order to allow the dogs to escape in the event of an attack? Or for ventilation in the desert heat? Or because those

---

[75] 724 F.3d at 474.

responsible for construction were summoned to other tasks? Or to conserve budgetary or material resources for additional structures? Only the Army can answer these questions in accounting for the construction of Kallie's kennel.

JUSTICE DEVINE argues that whether the Army actually caused Freeman's injury is a disputed issue of fact, which can be decided only by the jury.[76] Of course, we agree. But the dissenting JUSTICES argue that the determination of whether to apply the political question doctrine must await full discovery and the jury's verdict.[77] If the Army is found not to have caused Freeman's injury, then the case went to trial as it should have, and if the Army is found to have caused Freeman's injury, then the case should have been dismissed for want of jurisdiction—which no longer matters. Whether the political question doctrine applies or not, in the dissenting JUSTICES' views, the case must be tried. The doctrine is reduced to an irrelevance. But the doctrine does not protect against determining the Army's liability. No one argues that the Army can be liable for Freeman's injury. Rather, the doctrine protects against judicial reexamination of military decisions.[78] At least AMK9's defenses, and perhaps even Freeman's claim, cannot be adjudicated without putting the Army's conduct and decisions on trial. The political question doctrine requires us to be mindful of the broader implications of reviewing sensitive military decisions, such as maintaining respect for the separation of powers and the federalism system outlined in the United States Constitution,

---

[76] *See post* at __ (Devine, J., dissenting).

[77] *Post* at __ (Guzman, J., dissenting); *post* at __ (Devine, J., dissenting); *see Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 227–228 (Tex. 2004) ("If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the fact finder.").

[78] *See U.S. Dep't of Commerce v. Montana*, 503 U.S. 442, 457–458 (1992) ("When a court concludes that an issue presents a nonjusticiable political question, it declines to address the merits of that issue.").

minimizing interference with military prerogatives, limiting military expenditures on participating

in lawsuits (such as in discovery requests), and reducing contractors' liability for the sake of future

procurement efforts.[79] The inextricable involvement of military decisions in this case is not a matter

of fact but a matter of law.

The dissenting JUSTICES argue incorrectly that our analysis ignores our usual process for

deciding jurisdictional issues.[80] As we have explained,

> [w]hen the consideration of a trial court's subject matter jurisdiction requires the examination of evidence, the trial court exercises its discretion in deciding whether the jurisdictional determination should be made at a preliminary hearing or await a fuller development of the case, mindful that this determination must be made as soon as practicable.[81]

In this case, the trial court properly exercised its discretion to dismiss the case early on. "If the

evidence creates a fact question *regarding the jurisdictional issue*, then the trial court cannot grant

the plea to the jurisdiction, and the fact issue will be resolved by the fact finder."[82] The dissenting

JUSTICES assume that the issue in determining whether to apply the political question doctrine in this

case is whether, in fact, the Army is responsible for causing Freeman's alleged injury. But the issue

is not whether the Army can be held liable; all agree that it cannot be. The *jurisdictional* issue is

whether litigating the case inextricably involves reviewing military decisions. It certainly does. The

---

[79] *See McManaway v. KBR, Inc.*, 554 F. App'x 347, 350 (5th Cir. 2014) (Jones, J. dissenting from the denial of rehearing en banc).

[80] *See post* at __ (Guzman, J., dissenting); *post* at __ (Devine, J., dissenting).

[81] *Miranda*, 133 S.W.3d at 227.

[82] *Id.* at 227–228 (emphasis added).

dissenting JUSTICES ignore "the fundamental precept that a court must not proceed on the merits of a case until legitimate challenges to its jurisdiction have been decided."[83]

JUSTICE DEVINE's dissent also argues that today's decision "bars all tort suits where a military contractor—or any other defendant—is able to muster a mere allegation that a government actor whose decisions are insulated by the political-question doctrine partly caused the alleged harm."[84] This is simply not true. The cases we have cited differentiate among claims in which military decisions are or are not inextricably involved. If, for example, Kallie bit Freeman while being routinely exercised by her civilian-contractor handler, her biting Freeman would have had nothing to do with the military. The political question doctrine is not always easy to apply, but it certainly cannot be invoked to bar all claims that merely happen to have a military setting.

Whether the Army was justified in ignoring its requirements and constructing the kennel as it did is not a question a Texas court can answer. Thus, we hold that this case is nonjusticiable due to the presence of an inextricable political question. We need not consider the other grounds that AMK9 asserts for dismissal.

## IV

Hill Country did not join AMK9's plea to the jurisdiction or file its own. The court of appeals held that the trial court's *sua sponte* dismissal of the claims against Hill Country was erroneous because Hill Country did not submit authority to establish either Hill Country's immunity or the trial court's lack of subject matter jurisdiction. "Subject matter jurisdiction is an issue that

---

[83] *Id.* at 228.

[84] *Post* at ___ (Devine, J., dissenting).

21

may be raised for the first time on appeal[,] it may not be waived by the parties",[85] and it may—indeed, *must*—be raised by an appellate court on its own.[86] The political question doctrine examines justiciability, a jurisdictional matter. Thus, it may be raised at any time or by the court *sua sponte*.

Freeman's claims against Hill Country must be dismissed on the same political question grounds outlined above. Pragmatically, the case will almost certainly require examination of the same apportionment-of-liability questions outlined above, though up to this point Hill Country has not had to join or separately file a motion to designate a responsible third party. Because we favor early resolution of justiciability issues, we hold that the trial court was correct to dismiss Freeman's claims against Hill Country.

*    *    *    *    *

The district court correctly concluded that Freeman's claims inextricably involve a reexamination of military decisions beyond its power to conduct. The judgment of the court of appeals is reversed and judgment is rendered that all claims be dismissed.

_____
Nathan L. Hecht
Chief Justice

Opinion delivered: June 29, 2018

---

[85] *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445 (Tex. 1993).

[86] *See id.* at 445–446.